HOUSTON OIL CO. OF TEXAS v. AINSWORTH et al. (No. 54.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 27, 1916. Rehearing Denied Nov. 23, 1916.)

1. ADVERSE POSSESSION ☞108—ESTABLISHMENT OF BOUNDARIES.

Where jury found that plaintiff was entitled to an undivided 640 acres with improvements by adverse possession, it was proper to appoint commissioners to survey and segregate the land and to enter judgment upon their report.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 624–628.]

2. ADVERSE POSSESSION ☞114(1) — SUFFICIENCY OF EVIDENCE.

Where defendant claimed land described by metes and bounds, and in the alternative for the 640-acre statutory amount by adverse possession, and evidence showed several successive grantees holding adversely without deeds for 24 years, and thereafter by deed for 6 years until plaintiff purchased it, held sufficient to support finding in plaintiff's favor for an undivided 640 acres.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 682, 683.]

3. ADVERSE POSSESSION ☞106(1)—NATURE OF TITLE ACQUIRED—"TITLE BY ADVERSE POSSESSION."

Title acquired by adverse possession is a legal title and not an equitable one.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 604, 619–623.

For other definitions, see Words and Phrases, First and Second Series, Title by Adverse Possession.]

4. VENDOR AND PURCHASER ☞242 — BONA FIDE PURCHASERS—BURDEN OF PROOF.

Since title by adverse possession is legal, and not equitable, the burden of proof was not upon plaintiff claiming adversely in suit to try title to show that defendant claiming under deed was not an innocent purchaser without notice.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 603–605.]

5. VENDOR AND PURCHASER ☞242 — BONA FIDE PURCHASERS—BURDEN OF PROOF.

Where title asserted is equitable, the burden is upon him claiming to be a purchaser for value without notice to prove same by preponderance of the evidence.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 603–605.]

6. TRESPASS TO TRY TITLE ☞45(2)—INSTRUCTIONS.

Where plaintiff claimed alternatively for the 640-acre statutory amount of land by adverse possession as well as by metes and bounds, refusal to charge that plaintiff could recover no greater amount than shown by field notes describing the property by metes and bounds, which was less than 640 acres, was proper.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. § 67.]

Conley, C. J., dissenting.

Error from District Court, Hardin County; L. B. Hightower, Judge.

Suit by Charles H. Ainsworth and others against the Houston Oil Company of Texas. Judgment for plaintiffs, and defendant assigns error. Assignments sustained.

Parker & Kennerly, of Houston, and H. O. Head, of Sherman, for plaintiff in error. R. L. Durham, Tom J. Russell, W. R. Blain, and C. W. Howth, all of Beaumont, for defendants in error.

MIDDLEBROOK, J. This is a suit in trespass to try title instituted by Chas. H. Ainsworth in the district court of Hardin county, Tex., August 30, 1911, for a one-third undivided interest in 640 acres of land of the Uriah Davidson league in Hardin county, Tex., describing the land by metes and bounds in his petition. On November 13, 1913, Oliver C. Ainsworth and Henry W. Ainsworth intervened, claiming that they owned, together with the original plaintiff, C. H. Ainsworth, the entire 640 acres of land. The land was described in the original petition as follows:

"Six hundred and forty (640) acres out of the Uriah Davidson league in Hardin county, Tex., beginning on the south line of said league and at the southeast corner of Cook lake; thence north 700 yards; thence west 4,396 yards; thence south 700 yards to the south line of said league; and thence east 4,396 yards."

And they alleged that they and their predecessors had occupied the land for a period of more than ten years prior to the 21st day of September, 1879. They also plead in the alternative that, if they should be mistaken as to their right to recover the land described by metes and bounds, then they were entitled to recover 640 acres of land out of the said league to be so surveyed as to include certain improvements thereon located near the south line of the league, and about 200 yards west

of Cook Lake, and within 400 yards of said south line, by reason of the fact that they and their predecessors had held peaceable, continuous, and adverse possession thereof for the period of time intervening between the 1st day of January, 1858, and the 21st day of September, 1879, by reason of which they were entitled to an undivided interest of 640 acres, to be so surveyed as to include their improvements, and praying for commissioners to be appointed to survey and partition the land to which they were entitled.

On May 10, 1912, the Houston Oil Company of Texas filed its original petition in cause No. 2247, entitled Houston Oil Company of Texas v. C. H. Ainsworth, Oliver C. Ainsworth, H. W. Ainsworth, and F. Tim, alleging that it was the owner in fee simple of the 640 acres of the Davidson league described as follows:

"Beginning on the southeast corner of the lake on the Uriah Davidson league and on the south line of said league, which lake is known as Cook's Lake; thence north 700 yards to corner; thence west 4,396.7 yards to the northwest corner of this tract; thence south 700 yards to the southwest corner thereof, which is on the south line of said Davidson league; thence east on the south line of said league 4,396.7 yards to the place of beginning."

C. H. Ainsworth and others answered to this suit on the 24th day of August, 1912, and set up title to said land against the plaintiff in said cause by virtue of the ten-year statute of limitation.

The first case was cause No. 2148 on the trial docket, and subsequent to the proceedings above mentioned cause No. 2247, by order of the trial court, was consolidated with cause No. 2148, and the trial court directed the trial to proceed with the Houston Oil Company of Texas as plaintiff, and C. H. Ainsworth and others as defendants, and as such the cause went to trial, when the Houston Oil Company of Texas, plaintiff in cause 2247, and plaintiff in the consolidated cause, announced to the court that it dismissed its original cause of action against the defendants. The Ainsworths announced ready for trial upon their cross-action and plea for affirmative relief against the Houston Oil Company of Texas, contained in their first amended original answer, filed October 20, 1914, and the case thus made went to trial, resulting in a verdict and judgment for the defendants in the consolidated cause for 640 acres undivided interest in the Uriah Davidson league.

The trial court appointed commissioners to partition the land between the plaintiff and the defendants, with instructions to so survey and segregate the 640 acres as to include the Ainsworth improvements. The commissioners appointed partitioned the land, surveyed out the 640 acres so as to include the improvements, reported back to the court, and at a later day in the term the report of the commissioners was ratified by the court and final judgment entered decreeing the particular 640 acres of land to the defendants Ainsworth in accordance with the report of the commissioners appointed to partition the said land.

It appears also from the record that 640 acres of land, as described by metes and bounds in the pleadings of both parties, could not be surveyed out of the Uriah Davidson league, and that, taking the beginning point, and following the field notes as given in the pleadings, there could be only about 294.4 acres of the Uriah Davidson league contained in said field notes.

In the two suits above mentioned there were other parties than the Houston Oil Company of Texas and the Ainsworths, but they were disposed of during the proceedings, so that they have no interest in the appeal, and it is not necessary to mention them here. So the issues before us, as presented by the record, is as to the defendants' right to recover on their plea of ten-year statute of limitation and the plaintiff's right to recover on its record title from the sovereign of the soil.

The plaintiff showed in it record title from the sovereign of the soil; so, if the defendants finally recovered, they must do it upon their plea of the statute of ten years' limitation. Briefly stated, the testimony supporting the ten-year statute of limitation is as follows: Obediah Cook settled on the land in controversy in the latter part of 1858, or early part of 1859, and built a dwelling house and the sundry outhouses incident to a home, and he lived there about a year, cleared a field and cultivated it, and then sold out to Tom Brady, and Brady lived there and farmed the place until the War opened, and he then sold to George Oglesbee and went to the army. Oglesbee lived on the place until some time after the War, and he sold out to Cave Johnson, and Johnson lived there and cultivated the place a year or two, and sold to Buck Hooks, who rented the place for a negro named Bob Arline, and he and George Womack cultivated it a year. Buck Hooks then sold to Frank Womack, and Frank Womack lived on and cultivated the place three or four years, and sold to Ol Gilder, who sold it in about six months to one year to Joe McClusky, and he lived on it about six or seven years until he sold it to U. M. Gilder by deed dated July 22, 1882. This is the first actual deed introduced in evidence and the first time it occurs in the record that any land is described by metes and bounds. This deed gives substantially the description described in the pleadings, and calls for 640 acres of the Uriah Davidson league. U. M. Gilder sold to J. S. Kempner in February, 1883, and Kempner sold to A. L. Ainsworth January 19, 1884. These last conveyances were introduced in evidence, but it is not necessary to quote the deeds in the record. No claim to a specific 640 acres by metes and bounds seems to have been made by any of the

vendors and vendees until the deed from McClusky to Gilder in 1882, but the testimony does show that all of the parties were claiming 640 acres of the Uriah Davidson league. There is evidence showing the continuous, consecutive, adverse occupancy, claim, and control of the land from 1858 to 1884, many witnesses testifying to such facts, and several deeds were testified about as passing between the parties, but the deeds could not be introduced in evidence; but up to the execution of the deed from McClusky to Gilder in 1882 the evidence shows a conveyance of the improvements and claim by each party to 640 acres of land, without any specific boundaries.

Appellant's first assignment of error is substantially that the evidence is not sufficient to support a verdict for 640 acres or 150 acres of land under the ten-year statute of limitation, because it does not show consecutive occupancy and claim by appellees and those under whom they claim for a period of ten years, exclusive of the suspension of the law of limitations from 1865 to 1870.

Appellant's second assignment of error is practically the same as the first, except that it asserts that the plaintiff wholly failed to show continuous possession of any of the land in controversy for as much as ten years subsequent to the 22d day of July, 1882, the date of the deed from McClusky to Gilder, and that it is shown by the evidence that McClusky held under a deed and the contents of said deed, and what it conveyed is not shown by any legally sufficient evidence.

Then follows like statements as to deed from Ol Gilder to McClusky, from Frank Womack to Ol Gilder, from Buck Hooks to Frank Womack, from Cave Johnson to Buck Hooks, and Buck Hooks to George Oglesbee, and George Oglesbee, etc., and that, it being shown that these parties claimed under deeds, and not otherwise, while they were in possession of the land in controversy, and there being no legally sufficient evidence upon which the jury could find what land those deeds conveyed, the evidence is therefore insufficient to support a judgment for 640 acres or 160 acres of land under the ten-year statute of limitation.

The third assignment is that the trial court erred in not giving appellant's special charge instructing a verdict for the appellant.

Plaintiff in error presents four propositions under the first, second, and third assignments of error, and treats them conjunctively, and, the assignments being so analogous, we consider them as plaintiff in error has presented them in its brief.

The first proposition presented is:

"Possession taken and held under a deed or deeds is limited to the land described therein, and plaintiffs below having shown that several of the parties with whom they claim privity of estate, and upon whose possession they relied, and whose possession was essential to mature the title asserted by them, had taken and held such possession under and by virtue of written deeds, and there being no evidence to show what lands were included in said deeds, they thereby wholly failed to show themselves entitled to any specific land, or any land, and the verdict and judgment appealed therefrom is therefore unsupported by the evidence, and the court should have given the peremptory instruction requested by defendant below, who is here plaintiff in error."

Supporting this proposition the following authorities are cited: Hitchler v. Scanlan, 83 Tex. 569, 19 S. W. 259; Frazer v. Seureau, 60 Tex. Civ. App. 416, 128 S. W. 649; Cragg v. Cartwright, 56 Tex. 422; Carley v. Parton, 75 Tex. 102, 12 S. W. 950; York v. Lumber Co., 169 S. W. 187.

The second proposition under first, second, and third assignments of error is:

"Plaintiffs [below] and those under whom they claim not having claimed a specific tract of land, described in the deeds from McClusky to Gilder, from Gilder to Kempner, and from Kempner to A. L. Ainsworth, plaintiffs' ancestor, for as much as ten years during their possession of any portion thereof, they were not entitled to recover the specific tract described in such deeds and sued for by them."

The following authorities are cited under this proposition: York v. Thompson Lbr. Co., 169 S. W. 187; Louisiana & Texas Lbr. Co. v. Kennedy, 103 Tex. 297, 126 S. W. 1110; Louisiana & Texas Lbr. Co. v. Stewart, 61 Tex. Civ. App. 255, 130 S. W. 199.

The third proposition is:

"As plaintiffs below showed no right to recover other than through the deed from McClusky to Gilder, undertaking to convey a specific tract of land, described by metes and bounds, fully identified by calls for natural objects on the ground, they were not entitled to recover any land other than that so described, citing Connor v. Mangum et al., 127 S. W. 256."

The fourth proposition presented under the first, second, and third assignments of error is substantially that, since the plaintiffs below did not acquire title to the specific tract of land described in the deed from McClusky to Gilder, they could have acquired, at most, only an equity or equitable right, which, if seasonably asserted against McClusky, might have entitled them to have acquired his title if he had any at the date of the conveyance to an unlocated interest in the Davidson league, and through him to have asserted such right against the holder of the record title, and that to assert such title it would be necessary for the defendants in error to show that the Houston Oil Company of Texas was not an innocent purchaser for valuable consideration, without notice of plaintiffs' equity in the land; that the burden of proof is always on the party asserting an equitable right or an equitable title against the holder of the legal title, and because plaintiffs failed to discharge such burden of proof they failed to show grounds for recovery.

As we understand the authorities cited, they are not applicable to the case at bar. In Hitchler v. Scanlan, 83 Tex. 569, 19 S. W. 259, in so far as it deals with limitation title, it holds that it is error for the trial court to charge on the five-year statute of

limitation when no evidence was introduced as to payment of taxes, and that pleadings and proof under the ten-year statute of limitation did not cure such error. The citation 56 Tex. 422, is an error, and was intended, evidently, to be Craig v. Cartwright, 65 Tex. 422. That case does decide specifically that one holding as a naked trespasser under an unrecorded deed will mature his title, if left undisturbed for the required time, to the amount of land and to the extent of the boundaries called for in his deed, provided it be within the amount of land that may be so acquired under the law; but it does not hold that one may not recover other and different land under an alternative plea, and judgment of the court based on the proof and such plea, than a tract specifically described in another part of the pleadings. So, too, in York v. Thompson Lbr. Co., 169 S. W. 187. In this case Chief Justice Pleasants says:

"Appellant had not claimed the specific tract of 160 acres described in the petition for ten years prior to the institution of this suit, and there is neither allegation nor proof that to award him the 160 acres described in his answer would be a fair and equitable partition of the land between him and the appellee. Upon this state of the pleading and evidence the trial court was not authorized to render judgment for appellant for said 160 acres"—citing La. & Tex. Lbr. Co. v. Kennedy, 103 Tex. 297, 126 S. W. 1110; La. & Tex. Lbr. Co. v. Stewart, 61 Tex. Civ. App. 255, 130 S. W. 199.

He says further:

"There is no alternative plea that, in event it should be found that appellant was not entitled to recover the specific 160 acres described in his answer, he have judgment for 160 acres, including his improvements to be surveyed and designated under direction of the court, but, on the contrary, appellant expressly 'disclaims any right, title, or interest in and to any of the land sued for herein, save and except' the specific 160 acres described in his answer. But for the appellant's disclaimer the court might, under the prayer for general relief, have rendered judgment giving appellant 160 acres of land, including his improvements, and directing a survey thereof, but no relief could be granted inconsistent with the facts stated in the petition, and judgment could not have been rendered in appellant's favor for land in which he had expressly disclaimed any right, title, or interest"—citing Herring v. Swain, 84 Tex. 523, 19 S. W. 774; Milliken v. Smoot, 64 Tex. 171; McIlhenny v. Todd, 71 Tex. 400, 9 S. W. 445, 10 Am. St. Rep. 753.

None of the authorities cited by plaintiff in error dispute the proposition that, where one claims land described by metes and bounds in one part of his pleading, but in the alternative pleads for the statutory amount allowed under the statute of limitation in case he should be in error as to his right to recover the specifically described tract of land, and praying for commission to partition the land, and so survey it as to include his improvements, and where proof is introduced to sustain such plea, and the jury finds in his favor, and the commission is appointed, its report made, approved by the court, and final judgment entered accordingly, that such judgment is without warrant of law.

[1] In the instant case the land in controversy is presumed to be described by metes and bounds by both of the parties to the suit; and the appellee pleaded in the alternative that, if he should be mistaken as to his right to recover the specific 640 acres described in his pleadings, he was the owner of 640 acres of the Uriah Davidson league, and prayed for partition of the land by the court, and that his 640 acres be so surveyed out of the league as to include his improvements. Under these pleadings and the evidence and proper instructions of the able trial court, the jury found for the appellee 640 acres of the Uriah Davidson league, commissioners were appointed by the court, and the 640 acres of land was surveyed and segregated from the league for appellees, and upon the report of the commission to the trial court the report was approved and final judgment was entered for the appellees for the 640 acres so partitioned out of the league by the commissioners.

In the case of Lumber Co. v. Kennedy, 103 Tex. 297, 126 S. W. 1110, Judge Brown said that the proper course to pursue where one claims the statutory quantity of land by limitation is by partition under order of the court. The same doctrine is laid down in Bering v. Ashley, 30 S. W. 838, Judge Williams writing the opinion.

[2] In the instant case there was ample time for the maturity of title under the ten-year statute of limitation before the land was ever described by metes and bounds, and under proper instructions of the trial court the jury found 640 acres undivided interest in the Uriah Davidson league in favor of the appellees. There is evidence to support such finding, and we think the trial court pursued the proper course to determine what land the appellee should have.

[3] The fourth proposition asserts that, at best, the appellees could have acquired no more than an equitable title under the pleadings and the proof. We do not so understand the law. The title acquired by limitation is a legal title, and not an equitable title, and, so far as we are informed, this is a well-defined proposition of law by our Supreme Court. Burton's Heirs v. Carroll, 96 Tex. 326, 72 S. W. 581; East Texas Land & Imp. Co. v. Shelby, 17 Tex. Civ. App. 685, 41 S. W. 542; MacGregor v. Thompson et al., 7 Tex. Civ. App. 32, 26 S. W. 649. See, also, the authorities cited in these last cases.

[4] Such being the law, we do not think that the burden was upon the appellee to show that the appellant was not a purchaser for value and without notice of his rights. See, also, the following authorities: Paschal's Digest, art. 4624; Charle v. Saffold, 13 Tex. 111; Moody v. Holcomb, 26 Tex. 719; Word v. Drouthett, 44 Tex. 367; Paschal's Digest, art. 998; Rev. Stat. art. 1105.

[5] But, if the title asserted by the appellees had been only an equitable title, we

think the rule is to the reverse of what is claimed by the appellant. It would have devolved upon the Houston Oil Company to show by a preponderance of the evidence that it was a purchaser for value, and without notice of the Ainsworths' equity in the land, if an equity had been the only thing asserted by them. Baldwin v. Root, 90 Tex. 552, 40 S. W. 3. But the Ainsworths were asserting a direct legal title under the statute of ten years' limitation to the 640 acres of land, and, as we have said heretofore, we think the law pronounces such a real, and not an equitable, title.

[6] The fourth assignment of error is:

"The court erred in refusing to give special charge No. 4 requested by the defendant, Houston Oil Company of Texas and Maryland Trust Company, * * * said special charge No. 4 being as follows, to wit: '* * * Gentlemen of the jury, should you find for the plaintiffs or either of them under the charges of this court your verdict for any land or any part or interest in any land involved in this suit, you cannot in any event find in their favor for any land or interest not embraced within the field notes of the deed introduced in evidence under which plaintiffs claim, particularly the field notes of that deed introduced in evidence, dated July 22, 1882, from Joseph McClusky to U. M. Gilder, the same being as follows: [The description heretofore given follows in this special charge.] And it being shown by the evidence, which is undisputed in the case, the said field notes embrace not to exceed 294.4 acres lying upon or being a part of the Uriah Davidson league, and plaintiffs not having shown any right whatever to any land not upon the Davidson league by virtue of ten years' limitation under which they claim, you cannot in any event find in favor of plaintiffs, or any of them, for any land or interest in the land involved in this suit, exceeding the said number of acres, to wit, 294.4 acres."

If the appellees had no other plea than the one describing the land by metes and bounds, this assignment might be pertinent, but they having presented an alternative plea, as hereinbefore stated, we do not think the assignment is well taken, under the pleadings and proof of this case, and what we have heretofore said in passing upon the first, second, and third assignments of error is sufficient for a disposition of the fourth assignment of error. The fourth assignment of error is overruled.

The fifth assignment of error is but a repetition in different form and verbage of the first and second assignments, and what we have said in passing upon the first and second assignments is sufficient for a disposition of the fifth assignment of error.

No error appearing, the cause is affirmed.

BROOKE, J. I concur in the disposition of this case.

CONLEY, C. J. I cannot agree with the majority opinion filed in this case. Under the first assignment of error, plaintiff in error, Houston Oil Company of Texas, complains that the evidence is wholly insufficient to support the verdict, for the reason that the defendants in error have not shown any evidence legally sufficient that they or those under whom they claim and with whom they are in privity have for a continuous period of ten years (less the period of suspension of the statute of limitation) claimed 640 acres or any definite amount of land while the same or any part thereof was in the possession of the defendants in error and those under whom they claim and with whom they are in privity.

Article 4621, Paschal's Annotated Digest (Act Feb. 24, 1841), provides:

"The person who has or shall have right of entry into any real estate, consisting of lands, tenements, or hereditaments, shall make entry therein within ten years next after this right shall have accrued, and on failure shall be forever barred thereafter."

This statute is not to be literally construed. It does not mean that every true owner must make actual entry within ten years or be thereafter barred. Horton v. Crawford, 10 Tex. 383. It applies only to cases of adverse possession. Redding v. Redding, 15 Tex. 251. There is no legal necessity for entry unless the land is claimed and held adversely to another.

Article 4624, Paschal's Annotated Digest (Act Feb. 4, 1841), provides:

"Ten years of such peaceable possession and cultivation, use, or enjoyment thereof, without any evidence of title, shall give to such naked possessor full property, precursive of all other claims in and to 640 acres of land, including his, her, or their improvement."

Nowhere in the statute as it then existed is it provided that such possession should be adverse, nor was the term "adverse possession" used or defined in the statute. However, the courts in construing such statute held that the "peaceable possession" must, of necessity, be adverse to the claim of the true owner, and not held in subordination of his title.

In the case of Redding v. Redding, 15 Tex. 250, 251, Chief Justice Hemphill said:

"There was no possession adverse or otherwise; nor can the aid of the fourteenth section [the above statute] be invoked by the appellees. This bars the right of entry within ten years, but it only applies to cases in which the other party has been in adverse possession."

In the case of Hudson v. Wheeler, 34 Tex. 366, the Supreme Court, having under consideration this statute, quoting the language of Justice Story in the case of Pillow v. Roberts, 13 How. 477, 14 L. Ed. 228, in part says:

"Statutes of limitation are founded on sound policy. * * * The possession which is protected by them must be hostile and adverse to the true owner."

Although the original act did not provide in express language that the possession should be hostile to the true owner, it is to be seen that the statute was so construed by the courts.

In the case of Village Mills Co. v. Houston Oil Co., 186 S. W. 785, recently decided by this court, but not yet officially reported, this court, speaking of "adverse possession," as that term is used in limitation statutes, said:

"The decisions and text-books are unanimous in declaring that in determining what constitutes adverse possession that such possession must be: First, actual; second, visible; third, exclusive; fourth, hostile; and, fifth, it must be continued under a claim of right during the time necessary to create the bar. * * *

" 'Adverse possession' must be open and notorious possession. In order to make a good claim by adverse holding, the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the rights of the true owner are invaded intentionally, and with the purpose to assert claim of title adversely to him, so patent that the owner could not be deceived in the exercise of ordinary prudence over the true situation. The general rule deducible from the various authorities and text-books on the subject is that in determining whether possession is open, visible, and notorious, so as to charge the owner with notice of an adverse claim, the nature, situation, and use of the property are to be considered, as well as the quantity or proportion of the land actually occupied. It is therefore difficult or impossible to specify the acts which will under any and all circumstances and conditions constitute open and visible possession. The authorities seem generally to hold that it is sufficient if the land is appropriated in such a manner as to apprise the community that it is in the possession and enjoyment of the party claiming it."

See, also, 1 Cyc. 999; Texas, etc., Ry. Co. v. Maynard, 51 S. W. 255; McCarty v. Johnson, 20 Tex. Civ. App. 184, 49 S. W. 1098; Portis v. Hill, 3 Tex. 278.

On this subject Mr. Justice Wheeler, in the early case of Portis et al. v. Hill, Administrator, 3 Tex. 279, used the following language:

"What facts will amount to proof of such adverse possession, in each case, is a question of evidence. * * * They must be such as to give the party whose rights are invaded a cause of action. There must be a disseisien. But what will give a cause of action or amount to a disseisin, are often questions of no little difficulty. The difficulty of laying down a precise rule by which to determine what is an adverse possession, has often been felt and acknowledged. The clearest and most comprehensive definition' (it is said) 'of a disseisin and adverse holding, perhaps, is an actual, visible, and exclusive appropriation of land, commenced and continued under a claim of right, either under an openly avowed claim, or under a constructive claim arising from the acts and circumstances attending the appropriation, to hold the land against him who was seized.' "

It is therefore the settled law of this state that a claimant under this statute who claims a specific 640 acres, having actual occupation of only a portion thereof, must sufficiently describe the whole tract in his plea to identify it, and must prove his open and adverse possession and claim for ten years of the identical land so described, or must show by pleading and proof that the setting apart to him of such specific tract will not be an inequitable partition of the larger tract of land between himself and his co-owner. If such occupant fails to show that he has held adverse possession of the specific tract claimed by him for ten years, and also fails to show that it would be fair and just to his co-owner to have the specific tract claimed by

him set apart to him by the court, he would nevertheless, having otherwise complied with the requisites of the statute, be entitled, under proper pleadings and proof, to have the court designate and set apart to him such 640 acres as the equity and justice of the case required, and, if necessary, the court could appoint commissioners to partition the land for that purpose. Lumber Co. v. Stewart, 61 Tex. Civ. App. 255, 130 S. W. 199.

Under this assignment of error, it will be necessary to examine the evidence to ascertain if there is any testimony legally sufficient to·show that the defendants in error and those under whom they claim, and with whom they are in privity, have for a continuous period of ten years (less the period of suspension of the limitation statute) claimed and adversely held 640 acres, while the same or any part thereof was in their possession.

The witness Womack testified by deposition for the plaintiff substantially as follows: " * * * I was acquainted with the father and mother of Charles Ainsworth. They lived in Hardin county when I first knew them. Lee Ainsworth, the father of Charles H. Ainsworth, followed the business of farming and timbering. As to whether I can state the location of the tract of land upon which Ainsworth lived just after the Confederate War, well, when I first knew him he lived on Pine Island bayou. He then moved up to Village Creek, and afterwards down near Cook's Lake on the Uriah Davidson league, and occupied the place as a tenant of my brother, Frank Womack. This place was about 100 yards or more on the highland west of Cook's Lake. Yes; this place was settled by Obediah Cook before the War, and several other persons occupied it besides Lee Ainsworth and before he moved there. There was a little log dwelling house and about 10 or 15 acres of cleared land they farmed on. They had a peach orchard, cow pen, hog pens, corn cribs, smoke house, and fence on the land. Ainsworth and his family lived on the land twice, first with my brother a year or two, and then after he bought it from Kempner he lived there about four years. * * * Obediah Cook first settled the place before the War, the latter part of 1858 or early part of 1859. He made a crop, and lived there perhaps a year. He cleared a field and improved the place. He sold out to Tom Brady, and moved to Concord. Brady lived there and farmed the place until the War opened. He sold to George Oglesbee and his wife went back to her folks, and Tom went to the army. Oglesbee and his sister lived there from the time Brady went to the War until some time after the War. I went to the War in 1861, and stayed in the army until 1865. I was in Louisiana and Texas during the War. * * * I was at home once on detail duty in 1863. I came back home four or five times. I was stationed at Sabine Pass and in Louisiana, and each time I came home I found Oglesbee living on the land. * * * When I returned in 1865 after the War, he (Oglesbee) was still living there. Oglesbee sold out to Cave Johnson. Cave Johnson moved from Beaumont up there and made a crop. Cave Johnson stayed there a year or two and moved back to Beaumont. He sold to Buck Hooks. Buck Hooks did not live on the land himself, but had a negro tenant by the name of Bob Arline on it. I lived in a mile of the place and south of the Davidson league, and Bob and I cultivated the place and my place together the year Hooks owned it. Buck Hooks sold to my brother, Frank, and Frank lived on the land and cultivated it about three or four years. He had Lee Ainsworth

help him and living with him, during the time he owned it. Frank was not married. Ainsworth lived with him part of the time he owned it. My brother, Frank, sold to Ol Gilder. Ol Gilder did not own it but a very short while, about six months, or maybe a year, maybe not so long. He sold it to Joe McClusky, and then Joe continued to live there until he sold to U. M. Gilder. * * * I know about those sales. While I do not know the price or the exact dates, except as heretofore stated, I know that each one of them sold to the person who succeeded him in possession. Yes; I heard them all talk about having sold and bought the land at the time. I know there were sales from one man to another by having heard them discuss the sale and purchase of the land. You ask me the following question: 'Isn't it a fact, Mr. Womack, that all the parties you have testified about living on the place on the Davidson league inquired about would just move in and stay awhile and then move out, and that none of them ever set up any claim to 640 acres of land, and that none of them ever had a survey of 640 acres of land or of 160 acres of land made, and that it was further a fact that none of them ever had any survey made at all surrounding the improvements inquired about?' And I answer that they did set up a claim. They all claimed it, and whenever they left they sold the improvements and the claim. I have been on the place in question on Cook's Lake a thousand times where I have stated certain persons lived before and after the Confederate War. There was improvements on the place. There was a little house built by Obediah Cook. In time of the War, when George Oglesbee he was bushwhacking—he did not go in the War,— Dave Chandler went down there and burned George Oglesbee's house. That was about the close of the War, but I helped Oglesbee raise another house; me and old George Simpson. There was about 15 acres of cleared land, and it was worth about $10 an acre to clear and put in cultivation, and the house, of course, was worth $50 .or more to build. This place was worth about as much as the average settlement in those days; in fact, it was a little better than the average place in those days. I have been a farmer all my life. * * * I came to Jefferson county in 1856 and was 13 years old, and lived in Beaumont, * * * and moved to Concord in 1857 or 1858. Concord is about three miles from Cook's Lake and the place where I have testified about. * * * For the past fifty years I have never lived over two miles from the Uriah Davidson league of land in Hardin county. * * * The Ainsworth family never lived on but one place on the Uriah Davidson league, and that was the place settled by Cook, and they lived there, as I have stated, first as tenants of my brother for a year or so, and after he bought from Kempner he lived there three or four years. I cannot tell the day, month, or year any of the men moved on or off of the Uriah Davidson league, any nearer than I have stated before. They generally moved right out and the succeeding one right in; but at the most only a month or two elapsed. The land was never vacant from the time Obediah Cook settled it until Ainsworth moved off in the 80's when he came to Beaumont, more than one or two months at a time, and it was cultivated every year; and the improvements, the houses, fences, pens, etc., remained on there all the time, except when Oglesbee's house was burned down about the close of the War, and he remained on the land, and built another house, and I helped him raise this house, me and Simpson. * * * As to whether 'it is a fact that all the parties I have testified about living on the place on the Davidson league inquired about would just move in and stay awhile and then moved out, and that none of them set up any claim to 640 acres of land and that none of them ever had a survey of 640 acres of

land or of 160 acres of land made, and that it is a further fact that none of them has had any survey made at all surrounding the improvements inquired about,' well, they did set up a claim; they all claimed it. I have told you how long each one stayed there as near as I can heretofore, and if any of them ever surveyed the land I do not know anything about it."

This witness was brought into court before the trial was concluded, and was put on the stand by the defendants in error, and testified personally, and more in detail as to the occupancy of the persons who lived on the land, and in other respects modified his testimony to a considerable degree relative to the claim of Tom Brady and Obediah Cook to the land in question. This testimony is as follows:

"In 1858 old man Cook went down there and settled on what is called Cook's Lake; that is how this lake took its name. That was some time in 1858. Mr. Cook was on the land one year, about a year. He left there the latter part of 1859. You ask me if I know anything about the occupancy of Obediah Cook relative to the length of time he occupied it, and character of occupancy, and I answer that he went down there and cleared up a little field and built a house and lived there about a year, and then he moved out to Concord. After Mr. Cook moved off this land, Tom Brady moved on the same tract of land. Tom Brady bought Cook out and moved down there. Mr. Brady moved there and made one crop. I think he was there in 1860, and in 1861 Brady left there and went off in the army. After Brady moved off he sold to George Oglesbee, but I don't know just what he sold. I only know just from hearing them say they sold to one another is all I know about it. * * * I don't know how much land Tom Brady claimed nor do I know how much land Cook claimed, and don't know anything about it, as I never heard them say. I have stated that when Tom Brady moved off he sold to Oglesbee. Oglesbee stayed on the land all the time until the War broke up. He stayed on it four or five years, Oglesbee did. During those four or five years I don't know what he done, whether he claimed any specific tract of land. He might have claimed the whole swamp. He was laying out in the woods the five years he was there. He lived over in there, and he stayed in the swamps, and that was all the time of the War. I don't know just how much he was claiming. That was George Oglesbee. Oglesbee sold out to Cave Johnson, but I don't know what amount of land that Johnson claimed. They always sold the place, Cook's place and improvements, it was known as Cook's place. I don't know how much land was sold. I know who followed Johnson. Johnson sold to Buck Hooks, but I don't know what Hooks claimed on this land. I had a relative on this tract of land. He comes in after Hooks. I don't know what Hooks claimed, but he sold out to my brother, Frank Womack, but it is too hard for me to say what Frank Womack claimed, for I don't remember. You ask me if I was ever on this tract of land and on this place with my brother at any time, and I say I was over there some times, passing there off and on, as I lived within a mile of it. I know how much Ollie Gilder claimed there. He claimed 640 acres of land. Joe McClusky claimed 640 acres. All of them after that claimed 640 acres of land. Oglesbee was on this land about four or five years, and he was on this land all the time during this four or five years, so far as I know. * * * I do not attempt to fix any of the dates of those other transactions except Cook's. I know the different transactions and how long they stayed, but I was not concerned in it. It was between

forty or fifty years ago, and I did not think anything about it. * * * Tom Brady came in there that winter of 1859, and made a crop in 1860. When I say a man will go on the land and make a crop I mean by that he would go there in the spring or winter and make a crop the next spring and summer and gather it in the fall. When we talk about a man making a crop he generally lives on the land a year. I am satisfied from my knowledge of the time I and my father went there how long them two men lived there. I know positively that Cook was there in 1859 and Tom Brady went there in the winter, because I know how long they stayed. I have got something to fix my memory by. I know that Tom Brady moved out when the War opened. Tom moved out and went into the army and carried his wife to old man Henry Linnie's and left her there. He had not been married long when the War opened. When the War opened I don't know whether Tom joined Capt. Ross' company or not, but he went to Virginia in the first company that was raised. The War opened in the early part of 1861. Tom's crop was made in 1860, because he left in 1861. He could not have made a crop that year. I went to War in September, 1861, with a company that was made up at Sabine Pass. * * * My brother sold the place to Oliver Gilder, but Gilder did not live there. Gilder did not own it but a short time when Joe Mc-Clusky bought it. Now as to whether from the above time my brother sold it to Ol Gilder and Ol Gilder sold it to McClusky for about a month the place was probably vacant. After McClusky came there, as near as I can recall, he lived there on the place two or three years, and he then sold the place to Mitch Gilder. Joe stayed there and made a crop there. Mitch Gilder sold the place to Kempner. I don't think Kempner ever made any crop on it, because when Kempner bought it in the fall Lee Ainsworth still lived on it. He was working in the swamp, and he had Lee Ainsworth and Kempner both hired. Lee Ainsworth bought the place from Kempner and stayed there until he moved off to Beaumont.

"I have lived in Hardin county ever since 1858.

"The land was occupied continuously since it was settled by Cook up to the time Ainsworth moved off in the 80's."

J. H. Brady testified in substance:

"I was born March, 1866, and have known the land since I was ten years old. During all that time the land was improved and cultivated every year."

George Simpson testified:

"I am 77 years old, reside about two miles north of the town of Kountze, and have been in Hardin county since the early summer of 1865. I am acquainted with the location of the Uriah Davidson league of land in Hardin county, and Cook's Lake is located near the south line of the Uriah Davidson league. I am acquainted with the old improvements situated on the Uriah Davidson league, and they are located, to the best of my recollection, about 200 or 300 yards west of Cook's Lake, near the south line of the league. I have been acquainted with said improvements and field ever since the summer of 1865. I was acquainted with Tom Brady, George Oglesbee, Eliza Oglesbee, Cave Johnson, Buck Hooks, Frank Womack, Joseph McClusky, U. M. Gilder, and Lee Ainsworth. None of the above parties were related to me. I know that the Oglesbee family lived on and cultivated the land for some length of time, but don't know just how long. The rest of the parties I mentioned lived on and cultivated this land, but I don't remember just when or how long. Some of the parties I mentioned claimed this land as their own and some of them were claiming under a deed from Buck Hooks. I don't remember how the transfers were hand-

ed down. I only know of Buck Hook's deal. I wrote that deed myself, and I think that transfer was made either to Cave Johnson or to Frank Womack. The first time I knew this land was when the Oglesbee family was living on it in 1865. They continued to live on this land for some time, but I don't know just how long, some years, I don't remember who succeeded the Oglesbee family."

Elizabeth Oglesbee testified as follows:

"I am 73 years of age. * * * I knew George Oglesbee. He was my brother. He is dead. I knew Tom Brady. He was not related to me. I know where the Davidson league is located. I know a body of water in Hardin county known as Cook's Lake, situated near the south line of the Davidson league. I know where the improvements are that you say is on the ground on a part of the Davidson league lying immediately west of Cook's Lake, being evidence of an old field and other improvements which are claimed by the plaintiffs to have been made prior to the Civil War, and occupied by various persons under and through whom plaintiffs claim title to the land. They are about 300 yards west of Cook's Lake. George Oglesbee claimed the land and occupied and cultivated it. He occupied and cultivated the land from the time Tom Brady moved off the land until after the War, and Cave Johnson moved on the land. I know Tom Brady. The first person I know of who occupied the land west of Cook's Lake and on the Uriah Davidson league was Tom Brady. Tom was living there when we moved on the place. George Oglesbee bought the land from Tom Brady. My brother cultivated the land all the time he owned it. I don't know how many acres he cultivated, but it was a good big field. This was cultivated from the time he bought the place from Tom Brady in 1861 until after the Civil War."

Neal McClusky testified:

"My name is Neal McClusky. I am 64 years years old, and live in Hardin county. I came to Texas from Louisiana at the end of the War and settled in Hardin county; have lived there ever since. * * * When I came to Texas, George and Eliza Oglesbee was living near Cook's Lake on the west side of the land mentioned. I don't know how long the Oglesbees lived on the land. They were living there when I came to Texas. Cave Johnson lived on the land two or three years. Can't say exactly how long. I don't know how long he [Buck Hooks] claimed the land, but he had some one on it who made a crop or two. I knew Frank Womack. He lived on this land about three years. I knew Ollie Gilder claimed the land and had a tenant on it, but don't know how long. My brother, Joe McClusky, lived on the land after Ollie Gilder sold it, and occupied and cultivated about 20 acres. Joe went on the land about 1873 or 1874, and I lived with him. I think he moved off the land a little while and then went back and lived there until he sold to Mitch Gilder. * * * I know Buck Hooks claimed 640 acres of the land, and that included the house testified about. I say the parties claimed the land because they lived in the neighborhood and each one claimed the property when he lived on it as his home. I know Joe claimed the land, because I lived on it with him seven or eight years."

Joe Bumstead testified:

"I am 64 years old; was born and raised in Hardin county. I know where Cook's Lake is in Hardin county. I know where the Cook's place and improvements are west of Cook's Lake, and have known it all my life, ever since I was a little boy. I know all the parties you ask about, Obediah Cook, Tom Brady, George Oglesbee, Eliza Oglesbee, Joe McClusky, U. M. Gilder, J. S. Kempner, Lee Ainsworth. * * * Obediah Cook lived on the land when I was a

little boy. Tom Brady lived there before the War. George Oglesbee lived there all during the War. Joe McClusky lived there longer than anybody else. He lived on it about seven years, and then sold it to Mitch Gilder, who stayed there several months and then sold to Kempner, and Kempner made a crop and lived there until he sold to Lee Ainsworth. Ainsworth lived there about four years, and then rented it to Morris, who lived there two or three years after Ainsworth moved off. All the people who lived there claimed to own the place, except Bob Arlins, who farmed it for Buck Hooks, and me and my wife, who lived on it for Cave Johnson. The land was never vacant from the time I can first remember, which was before the War, until after Morris moved off, some time in the 80's, when he quit farming it for Lee Ainsworth. Somebody lived on it every year and made a crop. The improvements were there until some time in the 80's, just after the War, somebody burned the house down while Oglesbee lived there, but he built it up again right straight."

Mary Bumstead testified:

"I am 62 years old. I know the improvements and the field on the old south line since about 1868. Do not know Cook, but did know Tom Brady, George Oglesbee, Ollie Gilder, Eliza Oglesbee, Cave Johnson, Buck Hooks, Frank Womack, Joe McClusky, U. M. Gilder, J. S. Kempner, and Lee Ainsworth. Cave Johnson was my father. * * * The first one I knew lived on the land was Oglesbee. My father bought from him, and lived there about three years. He sold to Buck Hooks, and I and my husband lived there and cultivated the land. Buck then put a negro on the land. After that Frank Womack lived on the place. * * * Joe McClusky, Ainsworth, and Morris all lived on the place. * * * The place was occupied all the time from the time my father bought it from Oglesbee until the time Lee Ainsworth moved off some time in the 80's. I know that George Oglesbee claimed to own 640 acres of the Uriah Davidson league, because my father bought it from him. Buck owned 640 acres, because my father sold it to him."

A careful scrutiny and a close analysis of all the evidence of these witnesses wholly fails to show what improvement (other than a little house built by Cook and a little field cleared by him) either Cook or Brady had on the land, how much of a field was cleared, how much of the land was in cultivation, or that either claimed, cultivated, enjoyed, or occupied any other land than that actually improved. There is not a single circumstance in the record showing any acts incident to an appropriation by them of 640 acres. Some of the witnesses say that when Oglesbee's house was burned down, during the later years of the War, there was then only 10 or 15 acres in actual use and cultivation.

To constitute adverse possession in Cook and Brady to 640 acres, the evidence ought to be of a character sufficiently certain and definite in its nature to impress the belief upon the owner of the fee, as well as all others who might have had knowledge of the occupancy of the land by Cook and Brady, that it was their purpose and intention to hold adversely 640 acres thereof.

Adverse possession, accompanied with use, does not solely rest, it is quite true, upon the claim asserted by word of mouth. The right, as asserted, may arise from circum-

stances connected with the use and possession of the property. Converse v. Ringer, 6 Tex. Civ. App. 51, 24 S. W. 705.

In the case of Hall v. City of Austin, 20 Tex. Civ. App. 59, 48 S. W. 55, the Court of Civil Appeals on this subject said:

"It is not believed that the burden is more onerous upon one claiming a right by prescription than would be the case where he asserted a right to real property under the ten-year statute of limitation. In both cases it must be shown that he is asserting the right adversely to the true owner. * * * But it has never been held that in asserting the right under the statutes of limitation it was necessary for the one in possession to show that he openly, by word of mouth, asserted a right to the property, and that he was holding adversely to the true owner; but upon the contrary, these facts may be established by the character of the use of the property, and the circumstances connected with the possession. And if, from a consideration thereof, they are sufficient to indicate that the purpose was to claim the right and to assert an adverse use, they should be given that effect, although the possessor or user had not openly declared that such was his purpose or character of claim. Now, it is true in this case that it was not shown that the public or the plaintiffs openly asserted an adverse claim to the road in question, * * * but there are facts in the record which indicate that the public have used that road for a length of time and in a manner which would authorize the issue to be submitted to the jury whether the use was of a character indicating a purpose to establish a road over the land of the owner adversely to his rights."

As hereinbefore stated, we are left entirely in the dark as to the nature and character of the use, possession, and claim of both Cook and Brady.

In their brief defendants in error, by use of the following language, concede the correctness of my deduction in this matter, for they contend:

"The testimony as to each and all of them except Cook and Brady was that they claimed 640 acres, and under the law the possession of Cook and Brady extended to 640 acres."

The burden of proving title to the land by limitation rested upon the defendants in error. Every essential element of the statute, including the continuity and adverse possession of the various occupants of the land, must be supported by the evidence. Neither the court nor the jury is authorized to indulge in presumption as to the character of claim, possession, or use of the land by Cook and Brady, with whom it is necessary for defendants in error to link in perfecting the ten-year statute of limitation.

The court in its main charge to the jury instructed them, among other things, as follows:

"But in this connection [referring to the ten-year statute of limitation] you are charged that the statute of limitation was suspended by law during the period of time from the 28th of January, 1861, to the 30th day of March, 1870, which period covered nine years, two months, and three days; and therefore, in order to entitle a person claiming under the ten-year statute of limitation, as it existed prior to September 21, 1879, such person must have entered into the possession of the land at least nineteen years,

two months, and three days prior to September 21, 1879."

There is no objection to this portion of the court's charge. On a basis of the dates therein stated it was necessary for the defendants in error and those under whom they claim, and with whom they are in privity, to have commenced the adverse possession of, and laid claim to, 640 acres of the land out of said league, not later than July 19, 1860. It was consequently necessary to conclude the claim and possession of Cook and Brady, or, if not both, then at least that of Brady, to make out and complete the full ten years' adverse possession.

The only evidence of an assertion of hostile claim, either positive or by acts indicative of appropriation, to 640 acres of land, so far as the record shows, commences with the possession of Oglesbee. Oglesbee did not go into possession of the land until in the fall or winter of 1861. The evidence is not, therefore, sufficient to support the verdict, in that it does not show, either by positive evidence or by acts or circumstances upon the part of Cook and Brady, that they or either of them claimed or adversely held 640 acres of land, and therefore, in my opinion, said assignment of error should be sustained.