## HOUSTON OIL CO. OF TEXAS v. AINSWORTH et al.   (No. 854.)*

(Court of Civil Appeals of Texas. Beaumont. Nov. 18, 1922. Rehearing Denied Dec. 6, 1922.)

**1. Adverse possession ⏤114(2) — Evidence held to show claim to all land allowed by statute of limitations.**

Evidence *held* sufficient to show that one who concededly had been in adverse possession of a small clearing and improvements thereon was in possession claiming the full 640 acres of land then allowed him by the statute of limitations.

**2. Evidence ⏤471(26)—Testimony as to extent of claim by adverse possessor held not a conclusion.**

On the issue of the extent of adverse possession, testimony by a witness that a possessor under whom plaintiffs claimed, while in possession of the improvements and a small clearing, was claiming the full extent allowed him by the statute of limitations, whether construed as the repetition of what the possessor stated his claim to be, or as the definition by the witness of the possessor's claim, was not inadmissible as a conclusion.

**3. Evidence ⏤229—Statement of possessor as to extent of claim is admissible.**

Any statement made by one in adverse possession of land, in explanation of his holding while he was in possession, is admissible to sustain the claim of his successor in interest.

**4. Adverse possession ⏤37—Possession matured into title is not broken without dispossessing claimant.**

Where plaintiffs and their predecessors had been in possession of a tract of land for sufficient length of time to mature their title, the fact that the holders of the record title placed a tenant upon the land without disturbing the possession of the adverse claimants was not a dispossession of the adverse claimants, which started the five years' statute of limitations running against them.

**5. Appeal and error ⏤1097(5) — Finding by Court of Appeals not disturbed by Supreme Court held law of the case.**

Where the Court of Appeals on a former appeal had made findings and rulings against certain contentions of appellant, which were assigned as error in the Supreme Court, and the Supreme Court reversed the Court of Civil Appeals on another ground, those rulings were binding on a subsequent appeal to Court of Civil Appeals.

Appeal from District Court, Hardin County; J. L. Manry, Judge.

Trespass to try title by Chas. H. Ainsworth and others against the Houston Oil Company of Texas. Judgment for plaintiffs, and defendant appeals. Affirmed.

Kennerly, Lee & Hill, of Houston, for appellant.

W. D. Gordon, T. J. Baten, W. R. Blain, and R. L. Durham, all of Beaumont, for appellees.

WALKER, J. This was a suit in trespass to try title by appellees to recover of appellants 640 acres of the Uriah Davidson grant in Hardin county, Tex. It is conceded that appellants owned the record title, and that appellees' claim was under the statute of ten years' limitation. They sue for the land by specific metes and bounds, with an alternative plea for an undivided interest. Appellants also asserted a defense under the five years' statute of limitation. This is the second appeal in this case. Opinion by this court, Houston Oil Co. v. Ainsworth, 192 S. W. 614; by the Commission of Appeals, Houston Oil Co. v. Ainsworth, 228 S. W. 187.

On the former appeal, this court, Judge Conley dissenting, affirmed the judgment of the trial court, but on writ of error the case was remanded to the trial court on the proposition that the evidence did not sustain the claim of appellees under the statute of ten years' limitation. On the first trial, the only testimony offered on this question was quoted by Judge Conley in his dissenting opinion, which was held by the Supreme Court legally insufficient to raise the issue. Judge Conley quoted from the testimony of the witness Womack, as follows:

"I was acquainted with the father and mother of Charles Ainsworth. They lived in Hardin county when I first knew them. Lee Ainsworth, the father of Charles H. Ainsworth, followed the business of farming and timbering. As to whether I can state the location of the tract of land upon which Ainsworth lived just after the Confederate War, well, when I first knew him he lived on Pine Island bayou. He then moved up to Village creek, and afterwards down near Cook's Lake on the Uriah Davidson league, and occupied the place as tenant of my brother, Frank Womack. This place was about 100

---

⏤For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted January 24, 1923.

yards or more on the highland west of Cook's Lake. Yes; this place was settled by Obediah Cook before the war, and several other persons occupied it besides Lee Ainsworth and before he moved there. There was a little log dwelling house and about 10 or 15 acres of cleared land they farmed on. They had a peach orchard, cowpen, hogpens, corncribs, smokehouse, and fence on the land. Ainsworth and his family lived on the land twice, first with my brother a year or two, and then after he bought it from Kempner he lived there about four years. * * * Obediah Cook first settled the place before the war, the latter part of 1858 or early part of 1859. He made a crop, and lived there perhaps a year. He cleared a field and improved the place. He sold out to Tom Brady, and moved to Concord. Brady lived there and farmed the place until the war opened. He sold to George Oglesbee, and his wife went back to her folks, and Tom went to the army. Oglesbee and his sister lived there from the time Brady went to the war until some time after the war. I went to the war in 1861, and stayed in the army until 1865. I was in Louisiana and Texas during the war. * * * I was at home once on detail duty in 1863. I came back home four or five times. I was stationed at Sabine Pass and in Louisiana, and each time I came home I found Oglesbee living on the land. * * * When I returned in 1865 after the war, he (Oglesbee) was still living there. Oglesbee sold out to Cave Johnson. Cave Johnson moved from Beaumont up there and made a crop. Cave Johnson stayed there a year or two and moved back to Beaumont. He sold to Buck Hooks. Buck Hooks did not live on the land himself, but had a negro tenant by the name of Bob Arline on it. I lived in a mile of the place and south of the Davidson league, and Bob and I cultivated the place and my place together the year Hooks owned it. Buck Hooks sold to my brother, Frank, and Frank lived on the land and cultivated it about three or four years. He had Lee Ainsworth help him and living with him, during the time he owned it. Frank was not married. Ainsworth lived with him part of the time he owned it. My brother, Frank, sold to Ol Gilder. Ol Gilder did not own it but a very short while, about six months, or maybe a year, maybe not so long. He sold it to Joe McCluskey, and then Joe continued to live there until he sold to U. M. Gilder. * * * I know about those sales. While I do not know the price or the exact dates, except as heretofore stated, I know that each one of them sold to the person who succeeded him in possession. Yes; I heard them all talk about having sold and bought the land at the time. I know there were sales from one man to another by having heard them discuss the sale and purchase of the land.

"You ask me the following question: 'Isn't it a fact, Mr. Womack, that all the parties you have testified about living on the place on the Davidson league inquired about would just move in and stay awhile and then move out, and that none of them ever set up any claim to 640 acres of land, and that none of them ever had a survey of 640 acres of land or of 160 acres of land, made, and that it was a further fact that none of them ever had any survey made at all surrounding the improvements inquired about?' and I answer that they did set up a claim. They all claimed it, and whenever they left they sold the improvements and the claim. I have been on the place in question on Cook's Lake a thousand times, where I have stated certain persons lived before and after the Confederate War. There were improvements on the place. There was a little house built by Obediah Cook. In time of the war, when George Oglesbee—he was bush whacking; he did not go in the war—Dave Chandler went down there and burned George Oglesbee's house. That was about the close of the war, but I helped Oglesbee raise another house; me and old George Simpson. There was about 15 acres of cleared land, and it was worth about $10 an acre to clear and put in cultivation, and the house, of course, was worth $50 or more to build. This place was worth about as much as the average settlement in those days; in fact, it was a little better than the average place in those days. I have been a farmer all my life. * * * I came to Jefferson county in 1856 and was 13 years old, and lived in Beaumont, * * * and moved to Concord in 1857 or 1858. Concord is about three miles from Cook's Lake, and the place where I have testified about. * * * For the past 50 years I have never lived over two miles from the Uriah Davidson league of land in Hardin county. * * * The Ainsworth family never lived on but one place on the Uriah Davidson league, and that was the place settled by Cook, and they lived there, as I have stated, first as tenants of my brother for a year or so, and after he bought from Kempner he lived there three or four years. I cannot tell the day, month, or year any of the men moved on or off of the Uriah Davidson league, any nearer than I have stated before. They generally moved right out and the succeeding one right in; but at the most only a month or two elapsed. The land was never vacant from the time Obediah Cook settled it until Ainsworth moved off in the '80's when he came to Beaumont, more than one or two months at a time, and it was cultivated every year; and the improvements, the houses, fences, pens, etc., remained on there all the time, except when Oglesbee's house was burned down about the close of the war, and he remained on the land, and built another house, and I helped him raise this house, me and Simpson. * * * As to whether 'it is a fact that all the parties I have testified about living on the place on the Davidson league inquired about would just move in and stay awhile and then moved out, and that none of them set up any claim to 640 acres of land and that none of them ever had a survey of 640 acres of land or of 160 acres of land made, and that it is a further fact that none of them has had any survey made at all surrounding the improvements inquired about,' well, they did set up a claim; they all claimed it. I have told you how long each one stayed there as near as I can heretofore, and if any of them ever surveyed the land I do not know anything about it" (which testimony was again offered on this appeal).

The report of his opinion shows that he quoted also from the oral testimony of this

witness, which, in effect, destroyed the force of the above-quoted testimony, which was given by depositions; but, on this trial, appellants did not offer this oral testimony. In the record on this appeal, we find the following additional testimony on the issue of Brady's claim to 640 acres of land, there being no question as to his occupancy on the Davidson grant:

"Warren J. Collins, 89 years of age, testified that he moved into that part of Hardin county in 1852; that he never saw Obediah Cook but a few times, but knew Tom Brady very well. 'I got acquainted with him about 1858, and I knew him until he died. I knew George Oglesbee before the war and until he died.'

"He then narrates that he knew the sundry other occupants of that land and knew the location. He further said: 'I know where Tom Brady resided just before and at the beginning of what is known as the Civil War between the Northern States and the Southern Confederacy. I was at Brady's house in 1859 and in 1860, and he was living at this place near Cook's Lake. It was within sight of the lake. He had a house to live in, some little outhouses and a small farm. I visited him at the place I know one time and ate dinner with him there. I know from conversation with said Brady how and in what manner he claimed to occupy said land—what his claim consisted of. I had a conversation with him about the land, and he told me how he came into possession of it and who his predecessor was, but I have forgotten who he said occupied it before he did. He told me that he was claiming by the statute of limitations and proposed to sell me his statutory claim of limitation. I have described the character of the improvements on the said land occupied by the said Brady. They appeared to have been five or six years old; they were not right new. With reference to what was the nature of the claim to said land at that time in possession of Brady, or occupied by him, as to whether he was claiming the land adversely or whether he was there without such adverse claim, well, he was claiming the land adversely. That was the way he represented it to me.'

"Direct Interrogatory No. 11: 'If you have stated that Brady claimed the land adversely for himself, state whether or not his claim was restricted to a small portion of the land or whether it was unrestricted.' Answer: 'It was not restricted to the field, but was his whole statutory claim.'

"Continuing, the witness said: 'Brady, while in possession of the land, claimed the land by limitation. You say "in the possession and occupancy of the land by Brady, state whether or not the improvements were of a substantial nature or temporary nature, especially give the comparison of these improvements with the general average in settlements and homes of other people in that section of Hardin county;" and I say that the improvements were just about like the average in the country at that time.'

"The witness Collins testified on cross-examination as follows: Cross-Interrogatory No. 4: 'If you have stated in answer to the direct interrogatories that Tom Brady claimed adversely the land he occupied, then please state whether his claim was restricted to the small portion which he was using or whether he was just claiming generally everything he could get.' Answer: 'He was making a claim to all the statute of limitation would give him, and offered to sell it to me as such.'

"Further answering the cross-interrogatories the witness stated: 'No one has indicated or said anything to me about what my answer to the direct and cross-interrogatories propounded to me should be, only except to get what I know about the place; no one has intimated or stated to me what they would like for my answers to the direct and cross interrogatories to be. I have no kind of written memorandum to refresh my memory about the matters involved in my answers. My answers are made from my personal recollection. My answers are taken at the home of my son, V. A. Collins, in Dallas. No one is present except the notary and stenographer writing them. Mr. Blain came to talk to me about this matter some two or three weeks ago.'

"E. L. Ward, another witness testified that he had been living in Hardin county 65 years, and that he knew Tom Brady ever since he was a little boy; that he had visited Brady's place on Cook's Lake; that on one occasion about the time the war broke out he went with his uncle Zeke Chance and William Ward, the county surveyor, to Tom Brady's place on Cook's Lake; that his father wanted a place to move to and went down there intending to get a place to move to; that Brady had to go to the war and wanted to sell his place; and that his father went there to buy it.

"He further testified: 'I don't know as I could say what claim Brady was making to the land; that is, to the number of acres he claimed or anything like that. He had more land than my father wanted to buy; he had more land than he had business for, than my father wanted to buy; he just wanted a small home and a field what he could cultivate. I don't know how much land Brady had under fence in his field. He had a good big field there. I don't remember how much he had in cultivation; there must have been 10, 12, or 15 acres. When my father went there to buy the land he and Brady did not trade because he did not want to buy all the land Brady wanted to sell. I heard him talk about it later on; it seemed he owned all of it in there—the bigger portion of it. I don't know how much he owned. Brady claimed a whole lot of it; he told me later on how much he had when I was working in the cypress brake with him. On this occasion my father did not purchase because Brady wanted to sell more than my father wanted to buy. That is the reason he did not buy.'

"This witness also testified to knowing the other occupants of the land, and that it was continuously occupied."

[1] It is conceded by appellants that those under whom appellees claim were continuously on this land, cultivating and using a small portion thereof from some time in 1859 until long after the law of limitation was changed (September 31, 1879), reducing the limitation claim from 640 acres to 160 acres. They do not question the fact that

the proof is sufficient, under the opinion of the Supreme Court, to show that the claim was continuous during all these years to the improvements made on the land. Their contention is that there is no proof in the record that Brady claimed 640 acres of land, but as appellees' possession had continued long enough to complete the statutory period, they should be restricted in their claim to their improvements. We cannot agree to this construction of the evidence. It seems to us clear that the issue was raised that Brady was claiming, not only the improvements, but the statutory amount of 640 acres. The witnesses said he was claiming a large body of land. Mr. Collins said Brady told him:

"That he was claiming by the statute of limitations and proposed to sell me his statutory claim of limitations. * * * It [his claim] was not restricted to the field, but was his whole statutory claim. * * * With reference to what was the nature of the claim to said land at that time in possession of Brady or occupied by him, as to whether he was claiming the land adversely or whether he was there without such adverse claim—well, he was claiming the land adversely. That was the way he represented it to me."

This witness was narrating what Brady had said to him, was testifying to what Brady tried to sell him, was telling the facts of Brady's claim, how he came into possession of the land and the extent of his claim. It is clear from the testimony of this witness that Brady was in possession of the land under a prior claimant, and that he rested his claim on the statute of limitation, and that he was claiming what the law allowed a limitation claimant. As that was 640 acres, we cannot escape the conclusion that, under all the testimony, the issue was raised that Brady was in actual possession of his improvements, asserting a claim under the statute to 640 acres of land.

[2, 3] But appellants advance the proposition that this testimony by the witness Collins was only a legal conclusion, and hence not admissible. We cannot agree to that construction of his evidence. He did not purport to testify as to what he thought Brady was claiming, defining his construction of the facts as a claim under the statute, "his whole statutory claim," but he was testifying as to what Brady had told him. His testimony was as to what Brady had said at a time when Brady was trying to sell his claim to him. Clearly, this was not a conclusion of the witness Collins, nor was it a conclusion of Brady's. Any statement made by Brady in explanation of his holding while he was in possession was admissible. He said he went on the land under the law of limitation, and was claiming under the law of limitation, and was trying to sell his limitation claim. We must presume he understood the meaning of the language used by him, and knew the law to which he referred and on which he based his claim. But aside from what we have said, we believe it is safe to say that as the statutes of limitation are so generally known and the provisions so often invoked, we should assume that a squatter seeking to obtain a title under these statutes knows the number of acres to which he will be given title if he perfects his claim. But if we have not correctly construed the testimony of the witness Collins, and if, in fact, it should be held that Collins himself was defining Brady's claim, in our judgment his testimony would not be subject to the criticism urged.

Appellees were the only heirs of A. L. Ainsworth, who held the land under the following chain of title, which was offered in evidence: Deed from Joseph McCluskey to U. M. Gilder, dated July 22, 1882, describing the land as follows:

"Beginning at the southeast corner of a certain lake on said league, known as and called Cook's Lake, and from thence north (700) seven hundred yards; thence west the distance of four thousand three hundred and ninety-six and seven-tenths yards; thence south (700) seven hundred yards; thence east to the southeast corner of said lake to the place of beginning four thousand three hundred and ninety six and seven-tenths yards, containing six hundred and forty acres of land a part of the Uriah Davidson headright league situated lying and being in Hardin county, Texas."

Deed from U. M. Gilder to J. S. Kempner, dated February, 1883, describing the land as follows:

"Beginning at the southeast corner of a certain lake on said league known and called Cook's Lake and from thence north (700) seven hundred yards; thence west the distance of four thousand three hundred and ninety-six and seven-tenths yards; thence south seven hundred yards; thence east four thousand three hundred and ninety-six and seven-tenths yards, containing six hundred and forty acres of land, a part of the Uriah Davidson headright league lying and being in the county of Hardin and state of Texas, and also the following described tract out of and a part of the aforesaid Uriah Davidson league in Hardin county, Texas.

"Beginning at the distance of five hundred yards west of the southeast corner of a certain lake called Cook's Lake and from thence west the distance of three thousand four hundred and nineteen and four-ninths yards; thence south nine hundred yards; thence east three thousand four hundred and nineteen and five-ninths yards; thence north the distance of nine hundred yards, containing six hundred and forty acres."

Deed from J. S. Kempner to A. L. Ainsworth, dated January 19, 1884, describing the land as follows:

"Beginning at the southeast corner of a certain lake on said league known and called 'Cook's Lake' and thence north (700) seven

hundred yards; thence west ($4396^7/_{10}$) four thousand three hundred and ninety-six and seven-tenths yards; thence east ($4396^7/_{10}$) four thousand three hundred and ninety-six and seven-tenths yards, containing six hundred and forty acres of land, a part of the Uriah Davidson headright league, lying and being in the county of Hardin and state of Texas; and also the following described tract out of and a part of the aforesaid Uriah Davidson league in Hardin county, Texas:

"Beginning at the distance of five hundred yards west of the southeast corner of a certain lake called Cook's Lake and from thence west ($3419^4/_9$) three thousand four hundred and nineteen and four-ninths yards; thence south (900) nine hundred 'yards; thence east ($3419^5/_9$) three thousand four hundred and nineteen and five-ninths yards; thence north (900) nine hundred yards, containing six hundred and forty acres."

[4] In 1908, appellants placed a tenant on the land and duly paid all taxes thereon from that time for more than five consecutive years. Appellee Chas. H. Ainsworth instituted this suit on August 30, 1911. Appellees Oliver C. and Henry W. Ainsworth did not file their pleas in intervention, asserting a claim in their own right, until the 13th day of November, 1913. Chas. H. Ainsworth sued for only a one-third interest in the 640-acre claim. The three Ainsworths, appellees herein, were the only heirs of A. L. Ainsworth, to whom the land had been deeded by J. S. Kempner. Thus we see that Chas. H. Ainsworth filed suit for his interest within less than five years after appellant placed a tenant on the ground, but his two brothers did not intervene, claiming their interest, until more than five years after appellants had taken possession of the land through their tenant. The facts show, without dispute, that appellees had a tenant on the old improvements during all the years when appellants had their tenant on the land. On these facts, the contention is made by appellants that they matured a five years' limitation claim against two-thirds of the claim asserted by appellees. We cannot agree to this construction of these facts. Appellees and those with whom they were in privity had matured a legal title to an undivided interest of 640 acres in this grant prior to the time appellants took possession through their tenant. During all the time appellants were holding the land through their tenant, appellees were also in possession by their tenant. Being in possession and holding a legal title, their possession was not broken by appellants' occupancy.

[5] But appellants insist that appellees' claim was under the chain of deeds from Joseph McCluskey to A. L. Ainsworth, and that only about 310 acres of the land described in these deeds lie in the Davidson grant. On these facts they advance the proposition that the possession of appellees, through their tenant, was limited to the land described in those deeds, and hence the entry by them by tenant in 1908 matured a limitation title in their favor under the five years' statute of limitation to all lands on the Davidson, not included in the description in the deeds under which appellees held. On these deeds they advance the additional proposition that appellees' claim to the land must be limited by the deeds under which they hold, and the description therein contained, and hence, on the verdict of the jury in their favor, the recovery should have been limited to 310 acres. It also appears from the record that McCluskey, whose possession matured the limitation claim to the 640 acres, held under a deed from a prior limitation claimant, and that four of the other limitation claimants, whose possession was necessary to complete the claim, held under deeds consecutively from the one to the other. These deeds being lost, were not offered in evidence, nor does the record give their contents nor description of the land, which they or any of them purported to convey. Under these deeds, appellants also advance the proposition that no privity was shown between the limitation claimants, and hence no recovery could be had. The chain of deeds from McCluskey to Ainsworth and the testimony as to the five deeds in the limitation claim were offered in evidence on the first trial of this cause, exceptions thereto duly reserved and assigned in this court on the former appeal. Without a dissent on these questions, this court held against appellants' contentions.

Appellants assigned error on these holdings in their petition for writ of error to the Supreme Court, and, though the writ was granted, it was limited to the construction given by this court to the evidence of a claim by Brady to 640 acres of land. When the Supreme Court heard this case, although it had all these questions before it for review, and though each of them went to the heart of appellees' cause of action, they were not considered, but the cause was reversed solely and alone on the proposition that it was not shown that Brady was claiming 640 acres of land. If the Supreme Court had differed with this court on the construction of these deeds and of appellees' holding thereunder, it seems to us it should have given instructions to the trial court, in view of the new trial it had ordered. So, in our judgment, these questions are stare decisis. If appellees' claim to the land was not limited to the land described in the chain of deeds to their ancestor, their possession subsequent to 1908 was not so limited, and appellants acquired no title against them under the five years' statute. For a full statement of appellants' assignments of error, propositions thereunder, and statements in support thereof, we refer to the opinions on former appeal.

Believing that the only questions before us on this appeal are the sufficiency of the evidence to raise the issue that Brady was claiming 640 acres of land while in possession of the improvements on the Davidson grant, and the construction of the testimony of the witness Collins, and believing that no error is shown on these issues, it is our order that the judgment of the trial court be in all things affirmed.

It is so ordered.

HIGHTOWER, C. J., not sitting.

#### Additional Findings of Fact.

WALKER, J. At request of appellants, we make the following additional findings of fact:

(1) There is no evidence whatever that the Ainsworths' ancestors, to wit, A. L. Ainsworth and her husband, Lee Ainsworth, or either of them, held or occupied any part of the Davidson league in peaceable and adverse possession for any period of time prior to September 21, 1879.

(2) The field notes of the land on the Uriah Davidson league in actual possession of those under whom appellees claim are as follows:

"Beginning at a point ten varas west of the west bank of Cook's Lake in the south line of the Davidson league, thence north 393 varas to a point in old fence row in the old field. Now I will state that in taking the meanders of the old field that I began at that point 393 varas north of the south line of the league and meandered or ran out the old field from that point both north and south of a line running due west from that point. I think, however, I can connect my notes up so as to make a continuous survey of the old field.

"Thence north 65° west 115 varas; thence north 74° west at 184 varas; thence south 2° west 99 varas; thence south 11° east at 88 varas; thence south 2½° east at 128 varas; thence south 30° west 80 varas; thence south 10° east 100 varas; thence north 83° east 49 varas; thence north 32½° east 153 varas; thence north 34½° east 74 varas; thence north 31° east 107 varas; thence north 42° east 103 varas; thence north 43½° west 54 varas to the point of beginning"—containing 13 acres of land.

(3) From the evidence in the record, we are unable, as matter of law, to determine the location on the ground of the southeast corner of Cook's Lake. This issue was not submitted to the jury and no finding thereon was requested of the court. From this conclusion, it follows that we cannot say whether the field notes in the deeds under which appellees hold contain 310.6 acres of land, more or less.

(4) The taxes paid by appellant for the years 1908, 1909, 1910, 1911, 1912, and 1913 were paid before delinquency, and were paid on the whole of the Uriah Davidson league in controversy.

(5) During the period covered by such payment of taxes, appellant claimed under a genuine deed from the trustees of the Texas Pineland Association and John H. Kirby, dated July 31, 1901, filed for record in Hardin county, Tex., August 17, 1901, and duly registered in Hardin county, which deed described and purported to convey the whole of the Uriah Davidson league in controversy.

(6) On September 28, 1908, by decree of the federal court at Houston, all the right, title, and interest of Joseph McCluskey and his wife in and to the Uriah Davidson league in controversy was divested out of them and vested in appellant.

(7) Upon September 8, 1908, until the fall of 1915, Burrell (B. C.) Coe and Lafayette Hooks and wife, C. L. Hooks, as tenants of appellant, had continuous and peaceable possession of certain improvements on the Uriah Davidson league in controversy, which improvements were not situated within any reasonable construction of the field notes of the deed made to the ancestors of the Ainsworths, being the deeds in the chain of A. L. Ainsworth's title, said possession by appellants' tenants being adverse to all persons except appellants, and said tenants of appellants cultivating, using and enjoying the improvements so received by them.

HIGHTOWER, C. J., not sitting.